We will hear argument next in Eagle View Technologies v. Xactware Solutions, No. 21-1048. Mr. Perry, whenever you're ready. Thank you, Judge Taranto, and may it please the Court. The asserted claims here purport to monopolize the abstract idea of deriving roof measurements from aerial photographs using well-known math and generic user input. They are unequivocally ineligible under Section 101 as construed in Alice and a long line of this Court's precedents. These are pre-Bilski applications, but they were bad even before Bilski. Parker v. Fluke said you can't monopolize the Pythagorean Theorem, yet Claim 2 of the 436 patent does exactly that. It is drawn to correlating two images using nothing other than well-known photogrammetric calculations, trigonometry, including principally the Pythagorean Theorem. Does the claim say that? It says correlate. The claim says correlate. The specification makes clear at Appendix 372 and 373 that the correlation will be done by well-known photogrammetric equations, which can be found in a variety of textbooks, articles, and learned treatises. And there are several in the record, Your Honor, including Multiple View Geometry and Computer Vision, which is cited at Appendix 8347, which has a whole chapter on how to take two images of aerial roofs. 8347? 8347. That's Dr. Mundy's report. I was citing it, but the document's not actually there. The document is cited in Dr. Mundy's report. I realize this may not hurt your case, that even in the spec, there isn't actually an account of what the trigonometry is that's used. It just says everybody knows it. Go to the library. And, Your Honor, the obviousness references, and the obviousness case is not before the court, but the references in the obviousness case, the Shea reference, the Sanjavati reference, Leib, Verma, Arrow West, Avrahami, all applied these calculations, these equations, these known means of correlating photographs. And, of course, the obviousness case is important here to your question, Judge Duranto, because the court did not find that these references don't disclose every element of the claims. The court found that secondary considerations of non-obviousness overcame that showing. We didn't appeal that. We understand the standard of review of a jury verdict, but there's no dispute in this record that the equations, the ability to calculate the math. You just said something that at least my study of the case did not reveal to me. How do we know that the basis for rejecting the 103 claim to the jury was the secondary considerations? That's in Appendix 56 to 65, Your Honor. The Jamal opinion? The Jamal opinion, correct. She found that two of the references were not prior art, based on the priority date or public availability, and that five of them, while they disclosed every element of the claim, the secondary references, while she did not dispute that they did disclose them, the secondary references overcame. What do you make of the other patents, the one that require on-screen drawing of something called a pitch determination marker? The user interface claims, I think it's important to look at how that pitch determination marker was construed and applied. The infringement expert from my friends on the other side testified at Appendix 15957. It's some sort of graphical user interface that the user can manipulate on the screen that indicates the pitch of the roof. It is no more precise than that. It has no rules, parameters, guidelines. That's pretty much the official construction that was agreed upon, right? You just articulated it. Is there any difference between the agreed-upon construction? Well, as a matter of claim construction, I mean, the underlying Judge Kugler's construction was actually plain and ordinary meeting. It has to be capable of receiving the pitch, which is our infringement dispute, and the claim construction issue in the case, Judge Jenn, goes to whether the second or third element, the wireframe construction, applies that. No, but I don't dispute that the construction, as Judge Kugler articulated it, is extremely broad. It picks up anything on screen from which a pitch can be estimated or received. That is not a limitation at all. To get back to what I think was Judge Duranto's question, that is not a McRowe-type set of rules or another quasi-software claim. This is clearly not a software claim. It's an idea claim. It says anything on screen from which pitch can be calculated. And it's important to remember here, Your Honors, there's only three variables in the size of a roof. It's length, width, and pitch. Length and width are easily determined, as the specification explains, from the scale on the photo. So the only question is the calculation of pitch, and these patents describe doing it in two ways. One is the math claims, which is just literally math, trigonometry, and the other is this pitch determination marker, which can be as simple as drawing a line so that it sort of matches up and then using, again, the Pythagorean theorem to tell what that angle is. Is it 12 degrees, 15 degrees, 30 degrees, to determine the pitch? There is nothing in the claims, or for that matter in the specification, that describes how that is done. These are black box claims, right? It is a pitch determination engine or a roof estimation model. The protractor tool embodiment that's disclosed in the patent. What if the claim, instead of saying pitch determination marker, said the protractor tool, and that you have these axes, and then you have this arm, a movable arm, and you line up the arm along the edge of one section of the roof, and that's how you determine pitch. Would that have been enough? Judge Chen, I think the protractor tool is a much more specific implementation. It has a different problem. It is simply an electronic manifestation of a physical object that everybody used to do exactly the same thing, right? I mean, these are, in other words, mental steps claims processed on a computer. The protractor claim is not asserted against these products, of course, because our products don't use a protractor. So it would have got eagle view nowhere, and that claim is not among the asserted claims. In other words, that's one of the embodiments, but they have only asserted the generic pitch determination marker because, you know. But my question is, would that claim, as drafted the way I described it, be patent eligible in your view? Because now we have something that could arguably be regarded as a tool that is a specific implementation of this, what you would call specific pitch determination marker concept written right into the claim. The protractor claim, as drafted, is not eligible, Judge Chen, because it doesn't explain what this protractor is or how it works or limit it in any way. It's just another generic interface with an angle determining aspect to it. I certainly agree. My claim was more detailed, though. It described what it is and how it works.  Yes. Absolutely one could describe, I would think, a specific tool. And we have, of course, from the court, examples of specific tools that improve the functioning of a computer. The problem that this plaintiff has is that none of the claims that are actually in these patents have anything like the level of specificity necessary to overcome the abstract. The one I described, you would say, is patent eligible. I would say the one that you described with some more information is getting closer to the line. I'm not quite ready to go there, Judge Chen. The reason is there's a sliding scale of specificity as to interface tools. I think that's an accepted proposition. On the one end is do it on a computer using any interface. That's not eligible in itself because it simply describes the computer. On the other end would be a very specific interface that describes how it is used. If you had the programming for it, you're way over the line. If you have the rules or parameters or constraints for it, you're closer to the line. In other words, that's how I think of McGraw is sort of like an interface case. Here we have no rules, no parameters, no guidelines, no algorithms, no routines, no software, no hardware, any mouse, any point and device, any screen, any software. It is simply an interface. In that respect, it's like discourse decisions in CX loyalty and other cases that simply describing an interface without more doesn't add anything to the claim. It simply is describing the idea. Yes, of course, one could claim an interface, but these patents do not claim an eligible interface. You're not taking a position that computer modeling claims per se are ineligible? I think, Your Honor, many computer modeling claims are not only eligible but robustly innovative. There is very complicated technology in modeling any number of things, buildings or cells or anything else. And if you've actually built that model and disclosed it to the public, the routines, the algorithms, the software, the constraints, the parameters, the rules, of course you can do that. I mean, to me, McRow is our best case. And I think that shows where the line is that you have to describe enough to get you there, and those claims ought to be patented. These claims are not software claims. Eagle View stood up in the closing argument to the jury and said, we're not claiming software. These patents claim the idea of measuring roofs. And that's our point. That's exactly right. They don't claim any software. They don't claim any interfaces. They don't claim anything other than the idea of measuring roofs using photographs. Is there anything in the record that conclusively shows us that all of these claims could be performed by pen and paper? So I'll point you, Your Honor, to Appendix 59, which is in the district court's post-trial opinion, which quotes from a document which is PTX plaintiff's trial exhibit 457 at page 19, which is Mr. Pershing's inventor notebook. And I don't believe that page, unfortunately, the text is in the post-trial opinion. But if you look at the actual page in the record, and of course I'd be happy to send it in. I don't think it's in the appendix. It has Mr. Pershing's sketch of a roof and the equations, which he drew from a textbook, and the solution. And he lays it out all on a page exactly how to do, at least the 436 claims, pencil and paper on a single page of his inventor's notebook. And that's what he claimed to be the conception of the invention. And their technical expert said was the instance here, the reduction of practice of the invention. And it is absolutely done on pencil and paper with an XYZ equation, basic trigonometry and the Pythagorean theorem. Other than the inventor's notebook, there are many explanations, including, for example, the Shea reference, which was not held to be prior art, but is in the record, which shows both automated and semi-automated methods of calculating the sizes of buildings at Fort Hood, Texas, from aerial photographs. And the semi-automated ones were using human input in exactly the way here. So I think it's not actually disputed. The concept goes back at least to World War II in the aerial photographs of ships at sea and trying to figure out the distances between them and is carried on through. Computers make these things faster, but these claims don't claim any workings of a computer. They simply say, do it on a computer. They are Alice claims through and through. Mr. Perry, you're into your rebuttal time. Can I just ask you one fact? Is there an injunction in this case or not? There is an injunction in this case, Your Honor. There is a permanent injunction that's been issued, entered since the day of the judgment. My client has complied with it. We've taken our products off the market and are awaiting the court's judgment. We urge the court to reverse that judgment so that we can go back to competing with our friends here on a level playing field and get back into business. Maybe we should hear from Mr. Oakley now. Thank you. Thank you, Judge Toronto. May it please the court, John O'Quinn on behalf of Eagle View. The claims at issue in this case did not automate conventional ideas for route measurements. Instead, as in Fails, in Cardionet, in McRow, and in Enfish, the claims are directed to using specific techniques and unconventional arrangements, particularly of aerial photographs that was new to the field for solving a technological problem. In this case, doing roof estimation without on-site measurement. These are tools for measuring a roof without actually having to go and measure the roof. There's no dispute that the field was the field of roof measurement, roof estimation. And their own CEO at appendix 13,212 testified that at the time of these inventions, quote, at that point in time, the industry as a whole would hop on a roof, hop on a ladder, climb a roof in order to take manual measurements. Can I ask you this question? And you'll correct me if my recollection is wrong. My recollection from the briefs, from your briefs, description of and citations on the idea that something or other was not conventional, I think every single statement tied that to roofs. You don't assert, do you, that measuring the objects that are in photographs including any of these pieces of it was previously unknown? Well, Judge Taranto, I'm not suggesting that it was previously unknown, that you could use some types of photographs with some types of pictures to do some types of measuring. But first of all, the inquiry, as Burkheimer makes clear at page 1368 of that opinion, is not, of course, whether or not it was in the prior art. The question is, was it conventional, routine, well-known in the field? As you know, part of what we sometimes do on step one, not step two, is to try to identify what the focus of the claimed advance is. And if the advance here is nobody had ever been, we think there's an advance in measuring objects, including planar objects, in photographs, that would be one thing. It would be another thing to say, that was done before, that's not an advance, but nobody had ever done it for roofs. Is the second the thing that is true to say here, rather than the first? Well, Judge Taranto, first of all, I think it was an advance, no matter how you look at it, to use, in the context of the 436 claim in particular, non-stereoscopic images to do these types of measurements. That was heretofore unknown, period, full stop, as opposed to the use of stereoscopic images, which there had been some theoretical development of. But we saw a slight of hand at the podium earlier. What does stereoscopic mean? So stereoscopic means essentially taken from more or less the same angle. It's kind of how your eyes work, so that you get a three-dimensional image. The claims here are, the 436 claim specifically, is directed, number one, to the use of non-stereoscopic images. But all the other claims are broad enough to reach non-stereoscopic. That's not true, actually, Judge Clevenger. Specifically, the 770 and the 454 also would only reach stereoscopic images. Their own expert can see to it. Okay, but assume I disagree. I mean, the short is that there are a number of patents that are not limited to non-stereoscopic. So I agree that two of the patents, two of the claims, are not limited to non-stereoscopic. And I don't think there's a representative claim here. There are three different sets of claims. Did the district court, either in Kugler or Baum, analyze these claims individually? Yes. The court did look at the claims individually. And I think it's important to recognize the 436 is not only not just... Not just the claims individually. Did they give a separate analysis under 101 for each patent? There is a separate analysis, of course. And I think regardless of what they did, this court would have to engage in a separate analysis for these claims. But this point is very important. The 436 is not directed to using photographs in the abstract. We heard a sleight of hand here at the podium earlier. Throughout their brief, the argument they have made on appeal is that these claims were, quote, of using a computer to generate roof measurement reports, end quote. Now, today, Zach Weir says, well, the abstract idea is of doing roof measurements or deriving roof measurements from aerial photographs. You should hold them to what they have argued in this case, that the abstract idea is using the computer. Well, isn't what they said today just a different way of saying the same thing they said in the brief? Not at all, Judge Clevenger. There is no shortage of ways that somebody could use a computer to generate roof reports. This is a specific implementation that requires... It's up to the court to discern what's the abstract idea here. Well, Judge Tinn, I mean, I think... And if it strikes me that the abstract idea, potential abstract idea is producing a roof estimate report based on looking at pictures of the roof,  Well, Judge Tinn, I mean, we do operate in an adversarial process, and just because the court, you know, is aware of some piece of prior art that thinks renders a claim obvious as a matter of law, it would be sort of unusual for the court to reach out and say that the claim is invalid on this basis. Typically, it depends on particular records. And one thing here on the particular record that's important is the 436 claim is not about using photographs in the abstract. It's not about even using non-stereoscopic photographs in the abstract. It's about using non-stereoscopic photographs which have to be specifically defined. There has to be a top-down planar view, and there has to be an oblique view. So not parallel, not perpendicular, but oblique. That is an inventive choice. That is a specific decision of the type of photographs to use. And then they also... And I think that Judge Tinn, you pointed to this. The photographs also then have to be correlated. That is also a specific inventive choice here. And don't take my word for it. Look at exactly what their own expert said. On direct, at Appendix 17,625, and he said it again at Appendix 8,290, their expert pointed to a different system and said it doesn't, quote, correlate the first and second images. It was a different way of creating a 3D model of roofs that do not involve correlation, end quote. So correlation... I'm not sure I understand really what you think correlate means as it's used in the claim. Well, with respect to... Correlate could arguably be just a very generic word for a generic concept. Well, Judge Tinn, the patent here recites specific steps, just like the patent in FinJON that this Court upheld as eligible. The FinJON claims that a method comprising receiving by an inspector or a downloadable generating a security profile that identifies suspicious code in the received downloadable and linking the security profile to the downloadable. That satisfied the 101 how inquiry. Well, it's the same how inquiry here. The user selects two photographs for the 436 patent, two specific types of photographs. Again, they have to be top-down and oblique. Then it has to be correlated to a particular point. Then, yes, it's true in order to generate a three-dimensional model, math has to be used, but that makes this case indistinguishable from Thales. As the Court said there, that a mathematical equation is required to complete the claim method and system doesn't doom the claims to abstraction at page 1349. And what you have here is essentially the same thing there. The use of mathematical equations is just a consequence of the arrangement, in that case, of the sensors and the unconventional choices. Here, the unconventional choice was the use of these particular types of photographs. And as a result, what happens in Thales is that you would tabulate the position and orientation information from the resulting relationship. That's exactly what you have here, is that you have these unconventional choices to use specific types of aerial photographs in a specific way. And, yes, there is an application of mathematics, but it's no different than the application of mathematics in Thales or in Diamond v. Deere or in CardioNet or, frankly, even in McRow. And there's certainly no concern about preemption here because, again, and preemption, as the Supreme Court said in Alice, that is the concern that undergirds the 101-Jurisprudence. I think you had an opportunity in your red brief to address you versus Apple. Do you want to just take a second on that? I appreciate you raising that one. You versus Apple fits the classic case that this Court has dealt with in the minor run of cases where what you have is the mere computerization of conventional, well-known techniques in the field. And the field there was of photography. And it was not only... It was not disputed. The other side conceded that the use of... That is, the other side in... I guess it would have been you conceded. Thank you. That in you, that the use of one photograph to enhance another photograph was a well-known conventional technique. And so all you versus Apple involved was computerizing it. And the thing that I think is fundamental here, the claims do not claim generically collecting roof dimension data from any source. These are not claims that say... And that's what's happening in your patent. It's exactly what was happening in Thales. Why doesn't that lie to you? The use of the computer to massage the images. Whether or not the image is stereoscopic or non-stereoscopic is irrelevant to the correlation. Respectfully, Judge Clevenger, the use of the computer is not what was... Isn't that true that whether the computer is massaging stereoscopic or non-stereoscopic photos is irrelevant because the software conventionally can do either? I disagree that it is irrelevant. I think one of the things here that with respect to... It doesn't make any difference. Well, I think, Judge Clevenger, respectfully, I think what you're asking doesn't make any difference to the 101 Inquiry because the issue in you versus Apple was not whether or not it was conventional to use computers. It's whether or not it was conventional to enhance one image with another. And case after case after case in this Court, and frankly, it's what the Supreme Court was concerned about in Alice and in Bilski, is where you're computerizing things that were well-known techniques in the field. And this Court has looked at that at step one. For example, in CardioNet, the Court said, the traditional process and the claimed method produce results in fundamentally different ways. And in McGrow, it's remarkable for Zach Weir to say if that's their best case, they really are in trouble because the point in McGrow was there was, quote, no evidence that the process previously used by animators is the same as the process in the claims there. That's what you have. And what if hypothetically for this correlate two images invention, it could all be done by pen and paper? Like, let's say, for example, someone was looking at two photos, aerial photos of a roof, and person number one said, boy, it sure would be great to know what the pitch is of this roof. And then guy number two said, oh, I can show you how to do that. Here, just give me the two pictures and let me use some math. Let's just say Pythagorean Theorem for now. And I can do some calculations in comparing the two images and I can get you the pitch of the roof. Do you think that would be patent eligible? So Judge Chen, I think there are a number of questions one would have to answer, including whether or not there's anything inventive about selection of photographs in the first place, which there absolutely is in the 436 patent. And what I think is undisputed here and can't be disputed is nobody in the industry was doing roof measurements using that type of technique. And so what you don't... I just want to get a clear answer than at least I heard to the question I asked before, which is related to this. Was anybody outside the roofing industry using non-stereoscopic images to calculate areas of surfaces shown in the images? Well, Judge Toronto, I'll answer that. I don't think the patent says anything... This must be known because it says go find the textbooks, they show you how to do it. And the only thing that's new here is we're going to do it with roofs. I don't think that's... Respectfully, Judge Toronto, I don't think that's quite a fair characterization of the patents. This isn't just a field of use restriction. I think they're saying that the math that one would use... He's not inventing new math, right? I stepped on my first question. What is the answer to my first question? The answer to your first question is I'm not aware of anything in the art at the time that showed that it was conventional. And I don't just mean in the field of roof estimation, but that it was conventional to use these types of photographs to determine these types of specific types of measurements. Yes, photogrammetry had been used to be able to develop maps and other types of spatial relationships, but you can be sure that if it was, you would have read about it in their brief. But the only thing that they identify in their brief to suggest that there's something conventional here is the passage from the patent that does say that he's not inventing new math, that he is using mathematical equations, but he is just like in Thales. There was not new math that was being invented. Math was being applied to a new arrangement. In that case, it was a new arrangement of conventional sensors. In this case, it is a new arrangement that is the arrangement of using particular types of photographs, and it is to use them to obtain particular type of information, which makes this, again, fundamentally different. One of the things that the court looked at in Electric Power Group, for example, is whether or not it is a new source of information. This isn't the type of claim that goes to collecting any data from any source and then doing any type of analysis. Would the collection of a new source of information have made a difference in Electric Power Group? Well, if you look at the court's opinion, particularly at page 1355, it made an observation that this isn't even asking for new sources of information. Well, I certainly don't read that as being sort of a throwaway line. I won't presume to get into the court's head about that, or what this court said in interval licensing, which was to similar effect at page 1348. But it certainly suggests that what you have here is something that is different from most of the cases. I apologize, Judge Toronto, I see I'm well past my time. Start to finish up, please. Thank you, Judge Toronto. What you have here is nothing resembling what the Supreme Court was worried about in Alice or Bilski. Because we're not talking about fundamental economic techniques, we're not talking about methods of ordering human activity, and we're not talking about computerizing conventional routine techniques that were already well known in the field, which is what this court in SRI... Well, Judge Toronto, I mean... This starts with information, a picture, and it ends with an analysis of that put into a report combined with prices for possible human transactions of a roofing deal. Yeah, so Judge Toronto, I mean, I think this court has worn away from that level of generalization. I mean, the collection, analyzing, reporting syllogism is frankly in danger of becoming the new machine or transformation test if the court does the kinds of things that the court warned about in Enfish, where it's such a high-level abstraction. I mean, you could say that my tie is just information, what color it is, and it's just processed by an optical sensor. This court in both Enfish at page 1339 and McRow at page 1315 made clear that the fact that the output may be information, it may be intangible, does not render it to be patent ineligible. And that would be consistent with Judge Rich's opinion for the en banc court back in Enri Allipat, 33 F. 3rd 1526, which addressed some analogous situations and found that the claims were patent eligible. I'm happy to answer any questions the court may have on this or any of the other issues in the case, but these are the types of claims that in the words of Diamond v. Deere are directed to performing a function that the patent laws were designed to protect. And I urge the court to affirm the judgment below. Thank you, Mr. Oakley. Thank you, Judge Taranto. Talk to me about Thales. Your Honor, Thales is a case where you've got an advance over an existing technological process to take specific sensors, the inertial sensors, put them... It's about the configuration of sensors, right? Well, it's a particular kind of sensor to start with. It's not any sensor. It's an inertial sensor. It's to put them in a particular place, the configuration... Maybe here there's a configuration of different angles of collecting and sensing information. Your Honor, I think it's an excellent contrast because here the claim, claim two, says any two corresponding points. If they pick one vertex and limit it to that, it might be closer to Thales. Because what I meant was the top plan view and then the oblique view, and so therefore the analogy would be you've got your own different unique configuration of sensors detecting the information down below of the object from different angles. So we have aerial photographs. You basically... Aerial above... Aerial means above. There's basically two perspectives. You can have directly above, which is called the top plan, or you have oblique, which is everything else. So the selection of those two things is hardly a limitation, Judge Chen. It is simply describing two different views of the roof, which is what they claim. Of course, by the way, the pitch determination marker claim only involves one image, so we should be clear on that. There are not two images in the pitch determination marker claim. Mr. O'Quinn pretty much focused just on the two image. So on the two image point, you know, I heard my friend say that the unconventional aspect of these was the selection of the top plan and the oblique claim, which is to say if you don't have stereoscopic images, which are taken a wee bit apart by a special camera, you're taking any two aerial images. So they have claimed the world of aerial images for the purposes of measuring roofs. That is not, by the way, a technological process. That is a human endeavor that has been undertaken since we've had architects and builders. One could claim a technological solution to it, but these patents do not. They simply describe the possibility. You know, Mr. O'Quinn brought up electric power. At the end of that case, the court says there's an important and critical difference between a concrete solution to a problem and the idea of a solution to the problem. And these claims describe the idea of a solution, not the actual solution, which brings me back to Thales, Judge Toronto, which describes an actual solution. Take two inertial sensors, place them in these particular places. Yes, there's math, but that's a step toward the result, which is not claimed functionally, as these claims are, but rather practically and technologically. The Thales claim describes an invention. In fact, it's a device. Here we have an idea, and I think that's a very nice divide between these claims. These are the kinds of claims that say, I have a great idea. I can measure a roof using pictures. And the Thales claims, which say, I have a great idea. I can measure the relative motion, and I'm going to do it in this particular way. And you disclose that to the world, and if it satisfies all the requirements of patentability, you can get it. Judge Chen, you asked my friend about the correlation step. I would simply refer the Court to Appendix 515, Column 5, which was the 840 patent, and Appendix 372-73, Columns 6 and 7, which is the 436 patent, which says, in so many words, that it's done by the algorithms known in the art, textbooks, learned treatises, and so forth, which brings me to, Judge Toronto, your question, was this known in the art? Of course this was known in the art. This is not a mystery. There are chapters and treatises and books all about this thing. But, and I want to make this point important, and I hope to end on this, let's suppose Mr. Pershing, sitting in his backyard, taking a picture of his wife's birdhouse, was the very first person in the world to come up with the idea of measuring a roof from those photographs. These claims are still ineligible. This is not an obviousness case. This is an abstract idea case. He did not claim a particular concrete, specific, technological solution that meets the requirements of Section 101 in this court's precedence. This is simply the idea. You know, I said these are pre-Bilski claims, but these were bad under O'Reilly versus Morse. This is claiming, like the 8th claim in O'Reilly, this is claiming the idea of roof measurement. The idea of taking photographs and translating them into measurements. That can't be done. Other things in this field of course could be patented, but if you look at the claims and I said I would be last, but I but I apologize. My friends accuse me of oversimplifying the claims. I think it's extremely important, Your Honor, to look at the patents. Morse claim 8 is pretty darn big, but if you look at figure 8 in the 836 patent, which is Appendix 368, which is the inventor's own flow chart of how the correlation claim works, it sure looks a lot, Judge Chen, like Morse's claim 8. It basically says Which claim are we talking about? From which patent? This is the 436 in Appendix 368, figure 868. Receive a first and second aerial image, correlate them, generate a model, run a report. The flow chart in the patent is not an invention. I understand the claims have a few more words in them and we can talk all about that, but the basic logic flow of these patents, and by the way, for the pitch determination marker, it's figure 10 in the 840 patent at Appendix 511, and for the correspondence patents, which we haven't talked at all about, it's figure 11 in the 840 at Appendix 512. These flow charts show exactly the basic ideas that are being claimed, they correspond to the claim language, and they confirm that there is absolutely nothing patentable in any of these patents. Thank you, Mr. Perry. Thank you, Your Honors.